JUDGE CHIN

07 CV 10694

Counsel of Record:
Mark K. Schonfeld (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-1020
(212) 336-1322 (fax)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>GREAT AMERICAN TECHNOLOGIES, INC.<br>and VINCENT SETTEDUCATE a/k/a VINCENT SETTE,<br><br>Defendants. | 07 CV ___ (__)<br><br>COMPLAINT |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges the following against defendants Great American Technologies, Inc. ("GAT"), and Vincent Setteducate a/k/a Vincent Sette ("Sette") (collectively, the "Defendants"):

**SUMMARY**

1. Between approximately May 2002 and February 2007, GAT and Sette, a recidivist securities law violator who controlled GAT, sold common stock valued at over $2.3 million to over 100 investors in a fraudulent offering of securities.

2. GAT offers, among other products, a service called "MailCall" that purportedly allows users to hear readouts of e-mails and web pages over the telephone. To raise funds, GAT

and Sette made numerous materially misleading statements, and failed to disclose material information, to investors to induce them to purchase shares of GAT. For example, Sette told investors that GAT's MailCall system was capable of handling thousands of users, when, in fact, the system could not handle more than approximately 48 users simultaneously. Sette told investors that GAT had signed contracts with several companies and organizations to market and/or use the MailCall service, when, in fact, GAT had not entered into any such contracts. Sette made baseless revenue projections when he told investors that GAT would generate millions of dollars in revenue in its first years of operations. Sette also told investors that GAT would soon be conducting an IPO and its shares would increase in value, when in fact, GAT, had not taken any significant steps to conduct an IPO.

3. GAT and Sette also offered and sold unregistered GAT stock to investors. No registration statement was filed or otherwise in effect for these transactions. Also, no exemption or safe-harbor was available for these transactions.

4. Through this conduct, GAT and Sette violated Sections 5(a), 5(c) and 17(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a), Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

**JURISDICTION AND VENUE**

5. The Commission brings this action pursuant to authority conferred by Section 20(b) of the Securities Act, 15 U.S.C § 77t(b), and Section 21(d)(1) of the Exchange Act, 15 U.S.C. § 78u(d). The Commission is seeking permanent injunctive relief, disgorgement and prejudgment interest thereon from GAT and Sette. The Commission also seeks civil penalties

pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), against GAT and Sette. Additionally, the Commission seeks an officer and director bar against Sette pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2). Finally, the Commission seeks all other just and appropriate relief.

6. This Court has subject matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

7. Venue lies in this court pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 78aa. Certain of the transactions, acts, practices and courses of business occurred within the Southern District of New York. For instance, GAT and Sette sold shares of GAT stock to investors who reside in Nyack, New York.

8. GAT and Sette, directly and indirectly, singly and in concert, made use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or of the mails, in connection with the transactions, acts, practices, and courses of business alleged herein.

## THE DEFENDANTS

9. **GAT** is a New York corporation whose principal office is located in Newark, New Jersey. GAT offers, among other products, a service called "MailCall" that purportedly allows users to hear readouts of e-mails and web pages over the telephone.

10. **Sette**, age 48, is a resident of New Jersey. Sette is GAT's Senior Executive Vice President of Marketing and Sales. Sette controlled GAT and ran the company's daily operations.

3

Sette, whose real name is Vincent Setteducate, is a recidivist securities law violator. In 1997, the Commission charged Sette with participating in a fraudulent prime bank securities scheme, and with diverting investors' funds for his own use. SEC v. Setteducate, 97 Civ. 8472 (SAS) (S.D.N.Y.). Sette consented to a permanent injunction against future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5. In a parallel criminal action, Sette pled guilty to wire fraud in connection with the fraudulent prime bank securities scheme. On May 5, 1998, the Court sentenced Sette to five years probation and ordered him to pay $300,000 in restitution. United States v. Sette, 96 Cr. 1054 (FB) (E.D.N.Y.).

## FACTS

### Background – GAT Acquired Certain Purported Technologies

11.　In early 2002, Sette and another individual formed GAT to develop and sell new and innovative technologies.

12.　In February 2002, GAT acquired the marketing rights for the Ultimate Light Communicator ("ULC"), an infra-red wireless earpiece that purportedly allowed users to communicate with electronic devices, from a fledgling company that failed in its attempts to bring the ULC and the MailCall service to market. In May 2003, GAT purchased the rights to MailCall.

### GAT and Sette Solicited Investors to Buy Shares of GAT

13.　As a startup company, GAT needed funding to operate. Beginning in approximately May 2002, Sette, and other officers of GAT, began soliciting investors in a private placement.

14. Sette and other GAT officers prepared a PowerPoint presentation that Sette showed to investors. In the PowerPoint presentation, GAT indicated it was attempting to raise $3 million through its offering of common stock.

15. GAT initially sold 259,000 shares of stock at $.50 per share, and obtained approximately $129,500 in proceeds.

16. GAT, however, needed additional funding. From approximately July 2003 to February 2007, Sette and GAT's other officers solicited investors, including unaccredited investors, for additional funds.

17. GAT did not provide investors, including unaccredited investors, with independent audited balance sheets.

18. GAT did not file any registration statement with the Commission, nor was one otherwise in effect.

19. GAT's offering did not satisfy the requirements to be exempt from registration, or to fall within a safe-harbor from registration.

20. As of February 2007, over 100 people from numerous states, including New York, New Jersey, California, New Mexico and Kentucky, invested a total of approximately $2,312,000 in GAT.

**The Defendants Made Materially Misleading Statements and Failed to Disclose Material Information**

21. GAT and Sette told investors that MailCall could accommodate thousands of simultaneous users.

22. For example, in May 2006, Sette told at least one investor, "Investor A," that

MailCall was connected to a system that could accommodate thousands of users who were hearing read-outs of e-mails or web pages simultaneously.

23. GAT's and Sette's claim that MailCall could accommodate thousands of users was false. MailCall could not accommodate more than 24 to 48 users at a time.

24. GAT and Sette also falsely told investors that GAT signed contracts with major companies.

25. For example, in a letter to investors dated February 1, 2006, Sette indicated that GAT had signed three major contracts in January 2006 with "Callwave, Value Inn Hotels and National Federation of the Blind." Sette wrote, "we did give [Callwave] a discounted bulk rate; however this should still make us profitable very quickly. . . [Value Inn] will market MailCall to all their customers in 2006, their travel club and will be placing a significant portion of their employees on MailCall. The National Federation of the Blind . . . have endorsed MailCall and have asked us to speak at their annual meeting in February before 52 state chapter presidents."

26. GAT, however, had not entered into signed contracts with Callwave, Value Inn Hotels and National Federation of the Blind as of February 2006.

27. GAT and Sette made additional misrepresentations in the February 1, 2006 newsletter.

28. For example, the letter stated that: "GAT has recently signed contracts with the Colorado Bar Association, Denver Business Journals, Denver Chamber of Commerce, Mortgage Training Institute . . . [t]hey will be adding to the users of MailCall in 2006."

29. These claims about additional contracts were also false. GAT did not enter into contracts with the Colorado Bar Association, Denver Business Journals, Denver Chamber of

6

Commerce or with the Mortgage Training Institute.

30. GAT and Sette also made baseless revenue projections for MailCall.

31. For example, in the Powerpoint presentation that Sette helped prepare and showed to investors, GAT claimed it would earn revenue of $4.3 million from MailCall in its first year based on GAT getting 100,000 customers in its first year of operations.

32. GAT's and Sette's projections were simply baseless. For example, MailCall was only capable of handling up to 24 to 48 simultaneous users, and at the time, the company had no reasonable basis for claiming it would have 100,000 customers in its first year of operations.

33. GAT and Sette also made misrepresentations to investors about a purported IPO.

34. For example, in or around May 2002, Sette told an investor, "Investor B," that Sette was going through all the necessary hoops and GAT would probably go public within 12 months.

35. Sette subsequently e-mailed Investor B and told him that GAT was even closer to an IPO.

36. GAT's and Sette's representations about an upcoming IPO were false. In May 2002, GAT had not taken any significant steps to conduct an IPO. For example, GAT had not even filed a registration statement with the Commission.

37. GAT and Sette also made misrepresentations regarding GAT's key officers.

38. Sette and others drafted a private placement memorandum dated September 13, 2004, which they updated on approximately February 1, 2005.

39. On GAT's website in early 2005 and in its private placement memoranda dated September 13, 2004 and February 1, 2005, GAT claimed that a former officer of the New Jersey

Institute of Technology ("NJIT") Enterprise Development Center was GAT's Chief Financial Officer. The private placement memoranda also discussed this individual's tenure at NJIT's incubator and the success the companies at the Enterprise Development Center enjoyed during his tenure.

40. GAT's and Sette's claim that this individual was GAT's CFO was false. The former officer of the NJIT Enterprise Development Center never agreed to serve as GAT's CFO.

41. GAT and Sette also failed to disclose key compensation agreements to investors.

42. For example, GAT's private placement memorandum dated February 1, 2005 indicated that GAT would use $100,000 (which equals 20% of the maximum offering) from the offering to pay expenses, including Sette's salary.

43. GAT, however, used far in excess of $100,000 raised from the offering to pay expenses, including Sette's salary. For example, from February 1, 2005 through the end of that year, GAT used more than $176,000 of offering proceeds to pay Sette's salary and other expenses.

44. GAT and Sette also did not disclose to many investors that Sette had previously pled guilty to wire fraud and had been enjoined from violating the antifraud provisions of the securities laws based on his participation in a prime bank scheme.

45. For example, GAT and Sette did not disclose Sette's previous conviction or injunction in GAT's PowerPoint presentation, in GAT's private placement memoranda, or routinely when Sette and others orally solicited investors.

8

## FIRST CLAIM FOR RELIEF

**Violations of Section 17(a) of the Securities Act and Section 10(b)
of the Exchange Act and Rule 10b-5 thereunder by GAT and Sette**

46. The Commission repeats and realleges each and every allegation contained in paragraphs 1 through 45, as if fully set forth herein.

47. Defendants, directly and indirectly, singly and in concert, by use of the means or instruments of transportation or communication in interstate commerce, or of the mails, in the offer or sale, and in connection with the purchase or sale, of GAT common stock, have: (a) employed devices, schemes and artifices to defraud; (b) obtained money or property by means of, and otherwise made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, transactions and courses of business which operated as a fraud or deceit upon the purchasers of shares of GAT, and upon other persons.

48. As part of, and in furtherance of the violative conduct, as described above, GAT and Sette made material misrepresentations, and failed to disclose material information, to investors in GAT.

49. GAT and Sette acted knowingly and/or recklessly.

50. By reason of the foregoing, GAT and Sette have violated, and unless enjoined, will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

## SECOND CLAIM FOR RELIEF

**Violations of Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c) by GAT and Sette**

51.     The Commission realleges and incorporates paragraphs 1 through 50 by reference as if fully set forth herein.

52.     The Defendants, directly and indirectly, singly and in concert, have made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer and sell securities through the use or medium of a prospectus or otherwise when no registration statement has been filed or was in effect as to such securities and when no exemption or safe-harbor from registration was available.

53.     By reason of the foregoing, GAT and Sette have violated, and unless enjoined, will continue to violate, Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and (c).

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Commission respectfully requests that this Court enter a Final Judgment:

A.      Permanently enjoining GAT and Sette from, directly or indirectly, singly or in concert, violating Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5;

B.      Ordering GAT and Sette, jointly and severally, to disgorge all ill-gotten gains, derived directly or indirectly, from their violative conduct plus prejudgment interest on that amount;

C.  Ordering GAT and Sette to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3);

D.  Permanently barring Sette from serving as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. §78*l*, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. §78o(d), pursuant to Section 20(e) of the Securities Act, 15 U.S.C. §77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. §78u(d)(2); and

E.  Granting such other and further relief as the Court may deem just and proper.

Dated: November 30, 2007
       New York, New York

Respectfully submitted,

Mark K. Schonfeld (MS-2798)
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 4300
New York, NY 10281
(212) 336-1020
(212) 336-1322 (fax)

Of Counsel:
Kay L. Lackey (Not admitted in New York)
Robert Murphy
William Finkel

11